Rochelle GROSSER, Plaintiff,

v.

COMMODITY EXCHANGE, INC., Comex Clearing Association, Inc., the Board of Trade of the City of Chicago, the Board of Trade of the City of Chicago Clearing Corporation, Mid-America Commodity Exchange, Mid-America Clearing Corporation, Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Prudential-Bache Securities, Inc., Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Alvin Brodsky, Merrill Lynch Pierce Fenner & Smith Incorporated, Conticommodity Services, Inc., Norton Waltuch, Melvin Schnell, Gilion Financial, Conticapital Management, Inc., Conticapital Ltd., Naji Robert Nahas, Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, and Banque Populaire Suisse, Defendants.

No. 84 Civ. 412(MEL).

United States District Court,
S.D. New York.

July 18, 1986.

As Amended Sept. 11, 1986.

Cole, Raywid & Braverman, Washington, D.C., Mailman & Gigante, New York City, for plaintiff; Alan Raywid, Margaret E. Haering, Frances J. Chetwynd, Washington, D.C., Gary Mailman, New York City, of counsel.

Paul Weiss, Rifkind, Wharton & Garrison, Sheldon L. Berens, New York City, Glen F. Hackmann, Chicago, Ill., for ContiCommodity Services, Inc., ContiCapital Management Inc. and Norton Waltuch; Mark H. Alcott, Richard A. Rosen, William P. Farley, Peter W. Schneider, New York City, of counsel.

Sullivan & Cromwell, New York City, for Bache Group Inc. and Prudential-Bache Securities, Inc. (formerly known as Bache Halsey Stuart Shields Inc.); Marvin Schwartz, Richard H. Klapper, Marcy Engel, of counsel.

Seyfarth, Shaw, Fairweather & Geraldson, New York City, Shank, Irwin & Conant, Dallas, Tex., for Lamar Hunt, Nelson Bunker Hunt and W. Herbert Hunt; Daniel S. Greenfeld, New York City, Roger Goldburg, Rederick G. Steakley, Robert F. Wolin, Dallas, Tex., of counsel.

Rogers & Wells, New York City, for Merrill Lynch, Pierce, Fenner & Smith Inc.; William R. Glendon, Guy C. Quinlan, Susan A. Garcia, of counsel.

Skadden Arps Slate Meagher & Flom, New York City, for Melvin Schnell; Michael Diamond, Erskine D. Henderson, of counsel.

Perito, Duerk, Carlson & Pinco, P.C., Washington, D.C., for International Metals Inv. Co., Ltd.; John P. Wintrol, Robert L. Pokusa, of counsel.

Baer Marks & Upham, New York City, for Commodity Exchange, Inc. and Comex Clearing Ass'n, Inc.; Barry J. Mandel, Thomas E. Albright, William A. Brandt, Jr., of counsel.

Kirkland & Ellis, Chicago, Ill., for Board of Trade of the City of Chicago; John E. Angle, T. Webster Brenner, of counsel.

Murphy & Boyle Chartered, Chicago, Ill., for Board of Trade Clearing Corp.; Robert D. Boyle, Jay L. Statland, of counsel.

Townley & Updike, New York City, for Board of Trade of the City of Chicago and Bd. of Trade Clearing Corp.; James K. Leader, of counsel.

Cohn & Blau, Edward J. Swan, New York City, for MidAmerica Commodity Exchange; James L. Fox, Donald P. Colleton, Abramson & Fox, Chicago, Ill., of counsel.

Louis F. Burke & Associates, New York City, for Alvin Brodsky; Jeffrey N. Levy, Amy M. Slifka, of counsel.

LASKER, District Judge.

This lawsuit arises out of the events in the silver market during the 1970s and early 1980, including the dramatic rise in the price of silver in 1979 and the collapse of the market in March 1980, which have been the subject of detailed press coverage, books, congressional investigations, and much litigation. Rochelle Grosser, on behalf of herself and each person who held a long silver futures position between January 8, 1980 and March 27, 1980 (and who suffered a loss therefrom)[1] sues several commodities exchanges and clearinghouses as well as numerous firms and individuals for violations of various provisions of the Commodities Exchange Act ("CEA"), the antitrust laws, and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

The defendants, all but five of whom move to dismiss the claims against them in whole or in part, are: Commodity Exchange, Inc. ("Comex"), Comex Clearing Association, Inc. ("Comex Clearing"), Board of Trade of the City of Chicago ("CBOT"), Board of Trade of the City of Chicago Clearing Corporation ("CBOT Clearing") (collectively referred to as "the exchange defendants"); MidAmerica Com-

---

1. A motion for class certification is pending.

modity Exchange ("MACE");[2] Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Bache Group, Inc., Prudential-Bache Securities, Inc., Alvin Brodsky, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), Melvin Schnell (collectively referred to as "the non-exchange defendants"); Sheik Mohammed Al Amoudi, Sheik Ali Bin Mussalem, Naji Nahas, Gilion Financial, Inc., and Banque Populaire Suisse.[3]

The allegations of the amended complaint are accepted as true for the purposes of considering these motions to dismiss. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). The amended complaint asserts that the defendants, other than the exchanges and clearinghouses named in the complaint, engaged in a conspiracy to artificially increase the price of refined silver and silver futures contracts by

purchas[ing] large amounts of silver futures contracts in the United States market, ... seiz[ing] control of suppliers of refined silver in the United States and of vault receipts relating to triple nine bars in the licensed depositories of the Comex and CBOT and thereby ... prevent[ing] persons needing to liquidate silver futures contracts from doing so except at artificially inflated prices.

Compl. ¶ 38(c). According to the amended complaint, as a result of actions and transactions engaged in by these defendants, who held substantial "long positions"—or commitments to take delivery—and therefore stood to benefit from increases in the price of silver, the price of physical silver rose from $11 per ounce in September 1979 to $50 per ounce in mid-January 1980. Compl. ¶¶ 42–45.

The amended complaint also alleges that the named exchanges

negligently, willfully or in bad faith, and in concert, failed to take effective action to control rapidly rising silver prices even though they knew or recklessly ignored the fact that these prices were not the result of natural market forces, but were being caused by the unlawful scheme and conspiracy of the other Defendants.

... [T]he Exchanges continued to allow these other Defendants to use the facilities of the Exchanges without effecting regulatory controls, even though they were under a statutory duty to Plaintiff and other members of the investing public to prevent the manipulation.

Compl. ¶¶ 63–64. The governing boards of the exchanges, according to the amended complaint, did not take decisive action until January 1980, when they instituted position limits and "liquidation only" rules which had the effect of causing the price of silver to fall precipitously, destroying the liquidity of the market, and allowing those holding "short positions"—or commitments to make delivery—to dictate the price of silver futures contracts. Compl. ¶¶ 67–69. It is alleged that certain members of the governing boards of the exchanges

held short positions at times relevant to this action, and having been damaged by the rise in the price of silver futures contracts through January 20, 1980, individually and in concert, acting through the Exchanges, [by participating in and/or influencing such rule changes] sought to reverse such rise and cause the price of silver futures contracts to drop, to allow them to realize substantial profits and prevent them from facing impending bankruptcy.

2. Although Grosser named as a defendant in her complaint an entity known as the MidAmerica Clearing Corporation, Amended Complaint ("Compl.") ¶ 10, MACE has pointed out that no such entity exists and that the exchange itself acts as the clearinghouse.

3. Also named as defendants in the complaint are ContiCommodity Services Inc., ContiCapital

Management, Inc., ContiCapital Limited, and Norton Waltuch. Compl. ¶¶ 20–21. These defendants have entered into a settlement agreement with Grosser (acting on behalf of herself and the proposed class) which, if approved by the court, will constitute a full and final settlement of all claims asserted against them. *See* Settlement Agreement dated Oct. 11, 1985.

Compl. ¶¶ 70–71. The clearinghouses named as defendants in the complaint are alleged to have participated, individually and in concert, with the exchanges both in the failure to take action to maintain an orderly market prior to January 1980 and in the institution of the manipulative rule changes adopted in January 1980. Compl. ¶ 77.

Grosser, the representative of the proposed class and a resident of New Jersey, purchased two futures contracts on the MACE through her broker, Merrill Lynch: one contract of April 1980 silver on January 8, 1980, and one contract of June 1980 silver on January 28, 1980. Compl. ¶ 37. Grosser's long silver positions were liquidated at losses of $16,030 and $23,870 on March 17 and May 14, 1980 respectively. Compl. ¶¶ 83–84.

The amended complaint presents six claims. Compl. ¶¶ 85–99. The first asserts that all defendants other than the exchanges and clearinghouses named in the complaint conspired to manipulate and manipulated silver contract prices in violation of Section 9(b) of the CEA, 7 U.S.C. § 13(b) (1982). The second alleges that all defendants, acting in concert, defrauded plaintiff and the silver and silver futures markets and deceived plaintiff in connection with the making of silver futures contracts in violation of Sections 4b and 4c of the CEA, 7 U.S.C. §§ 6b (1982) & 6c (1976 & Supp. V 1981). The third claim charges all defendants with engaging in a conspiracy to unreasonably restrain interstate trade in silver and silver futures contracts with the intention and effect of raising and fixing the price of silver in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982). The fourth charges all defendants with attempting to monopolize trade in silver in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. The fifth claim alleges that the exchanges and clearinghouses named as defendants in the complaint willfully in bad faith and/or recklessly violated Sections 5(d) and 5a(8) of the CEA, 7 U.S.C. §§ 7(d) (1982) & 7a(8) (1976), which concern the requirement that the governing board of an exchange provide for the prevention of the manipulation of prices and the cornering of any commodity, and the obligation of an exchange to properly enforce trading rules. The sixth asserts that all defendants other than the exchanges and clearinghouses engaged in a pattern of racketeering activity comprised of acts of mail and wire fraud in violation of the RICO statute, 18 U.S.C. § 1962 (1982).

The amended complaint seeks treble damages under the third and fourth claims pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1982), and under the sixth claim pursuant to RICO, 18 U.S.C. § 1964(c).

A number of motions to dismiss the amended complaint based on a variety of theories are now before the court. A resume of the various motions by the several groups of moving defendants is set out in the margin.[4] At this time we reach only

---

**4.** The non-exchange defendants move to dismiss the RICO claim and all the CEA claims asserted against them as barred by the applicable statute of limitations; to dismiss the claims under CEA Sections 4b and 4c for failure to plead the elements of a violation and for failure to plead fraud with particularity; to dismiss the antitrust claims for plaintiff's lack of "antitrust standing"; and to dismiss the RICO claim for failure to plead the underlying fraud with particularity.

The exchange defendants move to dismiss all claims asserted against them on the ground that the complaint fails to allege bad faith sufficiently. They also move to dismiss all claims asserted against the clearinghouses on the ground that the complaint fails to state any claim upon which relief may be granted. Specifically, the exchange defendants move to dismiss the CEA claims asserted against them as barred by the applicable statute of limitations, for failure to state a claim against exchanges and clearinghouses on or through which plaintiff did not trade, for failure to plead the elements of either a CEA Section 4b or 4c violation, and for failure to plead fraud with particularity. The same defendants also move to dismiss the antitrust claims on grounds of plaintiff's lack of "antitrust standing," the exchanges' "antitrust immunity," and the failure of the amended complaint sufficiently to allege the exchange defendants' participation in a conspiracy.

MACE moves to dismiss the CEA and antitrust claims asserted against it for lack of personal jurisdiction and for improper venue. MACE moves specifically to dismiss the CEA claims as

those issues which are dispositive of the pending claims.

### Statute of Limitations

#### 1. CEA Claims

All moving defendants contend that plaintiff's CEA claims are time-barred. Defendants argue that in selecting a limitations period applicable to the claims brought under the CEA—which at the time Grosser traded provided no statute of limitations—the court should apply either the two-year period found in other sections of the CEA or, in the alternative, the two- and three-year statutes of limitations provided by the blue sky laws of New Jersey and Illinois respectively. Grosser contends that the applicable limitations period is New York's six-year statute of limitations for common law fraud.

The amended complaint alleges that Grosser liquidated the later of her two long silver positions on the MACE at a loss on May 14, 1980. Compl. ¶ 84. The complaint was filed on January 18, 1984. It follows, and the parties agree, that the CEA claims would be time-barred under defendants' suggested two- and three-year limitations periods but would survive under plaintiff's proffered six-year period.

Where a federal cause of action is not governed by any expressly applicable statute of limitations, a federal court must " 'borrow' the most suitable statute or other rule of timeliness from some other source." *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983). Although federal courts in such a situation have generally "looked to the limitation periods of their forum states governing the most nearly analogous cause of action," *Bache Halsey Stuart, Inc. v. Namm*, 446 F.Supp. 692, 693 (S.D.N.Y.

1978) (implied right of action under the CEA), the Supreme Court has stated:

> Nevertheless, when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking, we have not hesitated to turn away from state law.

*DelCostello*, 462 U.S. at 171–72, 103 S.Ct. at 2294.

The exchange defendants argue that the most suitable rule of limitations for a private right of action under the CEA is the two-year period already embodied in the regulatory scheme in CEA Section 14(a), 7 U.S.C. § 18(a) (1982), governing administrative reparations proceedings, and Section 22(c), 7 U.S.C. § 25(c) (1982), governing express private rights of action created by the 1982 amendments to the CEA.

We recently had occasion to consider this very argument in *Fustok v. ContiCommodity Services, Inc.*, 618 F.Supp. 1076, 1078–80 (S.D.N.Y.1985). In *Fustok* we noted the defendants' contention that the administrative reparations proceeding provided by Section 14(a) is a closely related form of relief under the CEA but found that no reported decision had apparently ever applied the two-year limitation period from Section 14(a) to an implied private right of action, even though the provision had been in existence since 1974. Rather, courts had consistently adhered to the practice of borrowing state statutes of limitation to implied rights of action brought under the CEA, before and after the Supreme Court's decision in *DelCostello* and the passage of the 1982 amendment to the CEA creating an express private right of action with a two-year statute of limitations.

barred by the applicable statute of limitations, for failure to sufficiently allege bad faith, for failure to plead the elements of either a CEA Section 4b or 4c violation, and for failure to plead fraud with the required specificity.

Alvin Brodsky, who joins in the motion to dismiss made by the non-exchange defendants,

also moves individually to dismiss all claims asserted against him for lack of personal jurisdiction as a result of improper service of process and to dismiss the CEA and RICO claims asserted against him for failure to state a claim and plead fraud with particularity.

Moreover, although we recognized in *Fustok* that it might be permissible to consider the 1982 amendment in attempting to divine the pre–1982 intent of Congress as to the appropriate limitations period for an earlier-accruing implied right of action,[5] we held that the controlling law of the circuit precluded the application of the new two-year federal limitations period to a pre-amendment cause of action. We noted that the Court of Appeals for the Second Circuit in *EEOC v. Enterprise Association Steamfitters Local 638*, 542 F.2d 579 (2d Cir. 1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), reversed the application of a statute of limitations which was enacted by Congress after the plaintiffs in that case had initiated their actions, holding that "the subsequent enactment cannot be indicative of prior congressional intent," *id.* at 590, and applied instead the most analogous state statute of limitations.

■ Defendants in this case have presented no reason to depart from the decision reached in *Fustok* not to borrow the two-year limitations period from federal law. *Accord Bartels v. Clayton Brokerage Co.*, 631 F.Supp. 442, 447–48 (S.D. N.Y.1986). Furthermore, this is not in our view a case in which "[s]tate limitations periods [should] not be borrowed [because] their application would be inconsistent with the underlying policies of the federal statute," *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 367, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977), at least as to its statute of limitations. Indeed, the limitations periods that defendants themselves suggest be borrowed from analogous state statutes are equivalent to or only slightly longer than the two-year limitations period Congress has expressly approved for post-enactment private rights of action under the CEA.

■ In contrast to *Fustok*, however, where the parties appeared to agree that New York statutes of limitations should provide the time periods if state law were to be consulted, the parties in this case disagree about the state from which a rule of limitation should be borrowed. A federal court in such a situation must look to the law of the state in which it sits, *Hollander v. Brezenoff*, 787 F.2d 834, 837 (2d Cir. 1986), and that law includes the forum state's borrowing statute if one exists, *see Cope v. Anderson*, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947).

New York's borrowing statute provides:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y.Civ.Prac.Law § 202 (McKinney 1972). Since Grosser is a nonresident, the borrowing statute's final exception clause does not apply in this case. The question presented is whether plaintiff's causes of action under the CEA accrued outside of New York. If they did, the court must determine, both for the foreign state and New York, the limitations period governing the state cause of action most analogous to the federal claim and then apply the shorter of the two. If, on the other hand, plaintiff's causes of action accrued in New York, the court simply applies the most appropriate New York limitations period.

■ The Court of Appeals for the Second Circuit has consistently held that for purposes of applying the New York borrowing statute, a cause of action in tort

---

**5.** The 1982 amendment creating in CEA § 22 an express right of action with a two-year statute of limitations included the caveat that "the enactment of [the amendment] shall not affect any right of any parties which may exist with respect to causes of action accruing prior to [January 11, 1983]." CEA § 22(d), 7 U.S.C. § 25(d). Even in the face of this non-retroactivity provision, it is proper under certain circumstances for a court to consider the 1982 statute in ascertaining Congress' intent as to earlier provisions of the CEA. *See de Atucha v. Commodity Exchange, Inc.*, 608 F.Supp. 510 (S.D.N.Y.1985) (citing *Sam Wong & Son, Inc. v. New York Mercantile Exchange*, 735 F.2d 653, 676 n. 30 (2d Cir.1984)).

accrues at the "place of injury." *See Stafford v. International Harvester Co.,* 668 F.2d 142, 148–50 (2d Cir.1981) (negligence and strict liability); *Industrial Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746, 747 (2d Cir.) (securities fraud), *cert. denied,* 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981); *Arneil v. Ramsey,* 550 F.2d 774, 779–80 (2d Cir.1977) (securities fraud); *Sack v. Low,* 478 F.2d 360, 365–68 (2d Cir.1973) (Friendly, C.J.) (violations of federal securities laws). Under the "place of injury" rule, a cause of action for fraud [6] is considered to accrue where the loss is sustained, and the loss "is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence." *Sack v. Low,* 478 F.2d at 366. It has been recognized, however, that "the plaintiff's residence need not necessarily be the situs of the economic impact of the fraud, and the court can properly consider all relevant factors in determining where the loss is felt." *Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F.Supp. 1421, 1425 (S.D. N.Y.1984). A court in a case such as this can consider how and where plaintiff paid for the securities, where plaintiff maintained the trading account in which the loss was reflected, and the manner in which the securities were handled in determining where the cause of action accrued. *See Sack v. Low,* 478 F.2d at 367–68.

Defendants suggest that in this case there are only two states in which the cause of action can be said to have accrued under the "place of injury" test: New Jersey and Illinois. Defendants' position has merit. Grosser is a resident of New Jersey, and to the extent she suffered a financial loss as a result of her futures transactions, she suffered it in New Jersey. There is no indication Grosser made her financial base or conducted her trading activities in any state other than New Jersey. To paraphrase the language in *Arneil v. Ramsey,* 550 F.2d at 780, when Grosser became a poor investor, she became a poorer New Jerseyite. Alternatively, Grosser's injury might be considered to have occurred when she liquidated her futures contracts at a loss on the MACE in Illinois. In a sense, her liability on her long futures position ripened when her open positions were closed by offsetting sales in the spring of 1980 on the MACE.

The next task is to determine which New Jersey and Illinois limitations periods would apply to plaintiff's CEA claims. A number of courts have held, in the absence of a state commodity fraud statute, that state blue sky laws provide the closest analogy to CEA claims and thus that state securities law statutes of limitations should be applied to federal causes of action brought under the CEA. *See, e.g., Boulder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 745 F.2d 50 (D.Md.1984) (CEA claim more analogous to state securities fraud than common law fraud since CEA and Maryland blue sky law are "both regulatory statutes designed to protect investors"); *Shelley v. Noffsinger,* 511 F.Supp. 687 (N.D.Ill.1981) (citing *Smith v. Groover,* 468 F.Supp. 105, 119–20 (N.D.Ill.1979)); *Grayson v. ContiCommodity Services, Inc.,* [1977–80 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 20,858 (D.D.C. 1979) (both local blue sky law and CEA "directed at fraud in connection with trading in regulated and specialized market, rather than at fraud in general"). The courts have employed the blue sky analogy even in situations in which the allegations in the complaint might not state a claim under the state statute. *See Grayson,* ¶ 20,858 at 23,521; *Smith v. Groover,* 468 F.Supp. at 122–23.

■ Both New Jersey and Illinois have blue sky laws, each of which provides the closest state law analog to plaintiff's CEA claims. The New Jersey Uniform Securities Law, N.J.Stat.Ann. § 49:3–47 to 76 (West 1970), provides a two-year statute of limitations for civil actions brought under

---

**6.** The same considerations would apply to determine the place where plaintiff's causes of action under CEA §§ 5(d), 5a(8) and 9(b) accrued, even though fraud is not an ingredient of those violations of the commodities laws. *See Sack v. Low,* 478 F.2d at 366 n. 2 (violation of Regulation T of federal securities laws).

its provisions. *Id.* at § 49:3–71(e). The Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121½, § 137.1–19 (1974), specified at the time relevant to this action a three-year statute of limitations for civil actions brought under the statute. *Id.* at § 137.-13(D).[7]

Assuming without deciding that the plaintiff's suggested six-year statute of limitations governing fraud actions, N.Y. Civ.Prac.Law § 213(8) (McKinney Supp. 1986), is the most appropriate limitations period under New York law, the borrowing statute requires the application of the shorter New Jersey or Illinois limitations periods to plaintiff's CEA claims. Under either of those states' statutes of limitations, plaintiff's claims are time-barred.

Plaintiff opposes this result on two grounds. First, she argues that her claim actually accrued in New York and that accordingly no comparison of New York's limitations period with that of New Jersey or Illinois is required under the New York borrowing statute. She contends that her cause of action should be found to have accrued in New York because (a) New York was the headquarters of the brokerage house through which she traded, the center of the alleged conspiracy to manipulate silver prices, and the place where the main effects of the market disruption were felt; (b) New York is the state having the greatest concern with the issues raised in this litigation; and (c) where federal claims are involved, federal courts should not be bound to construe borrowing statutes in accord with state interests such as protecting state defendants from forum-shopping plaintiffs but rather should apply the broadest statute of limitations necessary to effectuate the purpose of the federal statute.

---

**7.** Plaintiff does not suggest other New Jersey and Illinois rules of limitation which would more appropriately govern her CEA claims. We note in this regard that although several decisions by federal district courts sitting in Illinois have employed the Illinois blue sky limitations period to govern CEA claims, neither party has referred us to any decisions in which courts selected an analogous New Jersey statute of limitations. There are, however, decisions by the Court of Appeals for the Third Circuit and the federal district court in New Jersey that have considered the question of which New Jersey rule of limitation should be applied to claims brought under the federal *securities* laws.

In *Roberts v. Magnetic Metals Co.*, 611 F.2d 450 (3d Cir.1979), Judge Gibbons writing for the court held that New Jersey's six-year statute of limitations for common law fraud should be applied in preference to the two-year blue sky limitations period to a federal securities claim that could not have been brought under the state's blue sky law. *Id.* at 451–56. Judge Sloviter, although concurring in the result, stated separately that the concurrent operation of federal and state securities laws

> would in ordinary circumstances lead us to the application of the statute of limitations provisions in the state securities act, i.e. the two-year limitation period in the New Jersey blue sky law. That would seemingly supply the provision most consonant with and complementary to that of the federal scheme.

*Id.* at 459. Judge Seitz, dissenting, stated that a federal "court should look to the state statute that addresses the same regulatory area. If the

state as part of that regulatory scheme, enacts a statute of limitations, then that statute should govern federal claims." *Id.* at 461. The only New Jersey federal district court apparently to have addressed this issue in a published opinion, *see Corson v. First Jersey Securities, Inc.*, 537 F.Supp. 1263 (D.N.J.1982), leaned toward the middle ground of the *Roberts* concurrence:

> The more appropriate inquiry concerns whether the plaintiff is a member of the group protected by the remedy provisions of the state statute and whether the conduct of the defendant complained of under § 10(b) is of a type generally proscribed by the state statute and actionable thereunder.
>
> . . . .
>
> To hold otherwise, to differentiate among potential causes of actions by buyers under 10(b), runs the risk of unduly complicating the determination of the limitation issue.

537 F.Supp. at 1266–67.

It is not clear from these decisions how a federal court sitting in New Jersey would determine the limitations issue presented in the instant case. The issue of which New Jersey limitations period properly applies to claims brought under the federal *commodities* laws has never been considered by either the New Jersey district court or the Third Circuit Court of Appeals, and we decline at this time to embark on an involved construction of the New Jersey blue sky law in relation to plaintiff's CEA claims. Instead, we adopt the approach of federal courts elsewhere which have considered the question and determine that the most appropriate New Jersey limitations period is that provided by the state's blue sky law.

These arguments misconstrue the law. Facts such as the principal place of business of a key defendant and the place where a conspiracy was centered might well have a bearing upon a choice of law analysis under a "grouping of contacts" or "center of gravity" approach, but they are decidedly irrelevant to a determination of where a cause of action accrues under New York's borrowing statute according to the "place of injury" rule. *See Sack v. Low,* 478 F.2d at 365–66 ("cause of action accrues for purposes of the borrowing statute in the state where the injury is suffered rather than where the defendant committed the wrongful acts"). Likewise, although considerations of which state has the greatest concern with the subject of the litigation may have everything to do with the modern conflict of laws doctrine espoused by the New York Court of Appeals in other contexts, *see Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (applying "interest analysis" approach), the district courts in this circuit continue to be bound by the prediction (in the absence of state case law directly on point) of the Second Circuit Court of Appeals that for purposes of applying the borrowing statute the New York Court of Appeals would specify as controlling the place of injury in order to determine where a cause of action accrues. *See, e.g., Bank of Boston International v. Arguello Tefel,* 626 F.Supp. 314, 316–17 (E.D.N.Y.1986); *Avagliano v. Sumitomo Shoji America, Inc.,* 614 F.Supp. 1397, 1404–05 (S.D.N.Y.1985); *In Re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740, 800–02 (E.D.N.Y. 1984); *Lang v. Paine, Webber,* 582 F.Supp. at 1424–25; *Maiden v. Biehl,* 582 F.Supp. 1209, 1212 (S.D.N.Y.1984).

To plaintiff's contention that federal courts adjudicating federal claims should not construe the borrowing statute in such a way as to further the state policy "to protect New York resident-defendants from suits in New York that would be barred by shorter statutes of limitations in other states where non-resident plaintiffs could have brought suit," *Sack v. Low,* 478 F.2d at 367, but rather should interpret it in a way that results in the application of the broadest statute of limitations which would effectuate the purpose of the federal statute, there are two responses. First, all but one of the governing decisions of the Second Circuit Court of Appeals in this area concerned federal claims, and the Court still applied the "place of injury" rule. Second, it is difficult to see the validity in this case of an argument, on policy grounds, for the application of the longest statute of limitations which could conceivably result under the borrowing statute, when the New Jersey and Illinois limitations periods that would otherwise apply to Grosser's claims themselves equal or exceed the period adopted by Congress in 1982 for private CEA actions.

The second ground on which plaintiff opposes the application of the New Jersey and Illinois limitations periods is the holding by the Court of Appeals for this circuit in *Stafford v. International Harvester Co.,* 668 F.2d 142 (2d Cir.1981), that "New York's borrowing statute does not require the application of the statute of limitations of a jurisdiction if the cause of action could never have been brought in that jurisdiction." *Id.* at 152. In essence, plaintiff claims that because personal jurisdiction could not be asserted over all the defendants in this action by the courts of either New Jersey or Illinois, her cause of action cannot be said to have accrued in those states and that the borrowing statute therefore requires application of a New York rule of limitation.

Plaintiff correctly describes *Stafford*'s teaching that insofar as the purpose of the borrowing statute is "to prevent a plaintiff from forum shopping, it makes no sense at all to apply the shorter limitation of a state where the defendant could not have been sued." *Id.* at 152. She misreads the decision, however, to the extent that she finds support there for the proposition that it makes no sense to apply the shorter limitations periods of states where *all* the defendants could not have been sued. Rather, *Stafford* only requires that as to the

claims asserted *against each defendant,* suit could have been brought in the foreign state from which a rule of limitation is borrowed according to N.Y.Civ.Prac.Law § 202. Indeed, *Stafford* itself held that the borrowing statute required application of the appropriate Pennsylvania statute of limitations to the claims against a defendant the parties agreed was amenable to suit in that state but not to the claims against a defendant the parties conceded could not have been sued there. *Stafford,* 668 F.2d at 150–54; *see Bank of Boston International,* 626 F.Supp. at 318 (applying *Stafford*).

▆ In this case, but for the *Stafford* rule, Grosser's CEA claims accrued for borrowing statute purposes in New Jersey or Illinois. Plaintiff does not contend that her claims accrued in one of the two states rather than the other under the "place of injury" rule. The question, then, as to each defendant, is whether personal jurisdiction could have been properly asserted in either New Jersey or Illinois.[8] If so, the borrowing statute applies and the CEA claims are barred.

Plaintiff has failed to come forward with any evidence whatsoever that particular moving defendants would not be amenable to suit in either New Jersey or Illinois. As we see it, the burden of proving lack of amenability to suit or lack of personal jurisdiction rests on plaintiff, who seeks to benefit from what she contends is New York's longer limitations period by invoking a judicially crafted exception to the applicability of the borrowing statute. *Cf. Bache Halsey Stuart, Inc. v. Namm,* 446 F.Supp. 692, 694 (S.D.N.Y.1978) (burden of proving residence on party seeking to benefit from New York's longer limitation period). Consequently, we cannot say the *Stafford* rule precludes the general application of the New Jersey and Illinois limitations periods to plaintiff's CEA claims.

Thus, we conclude that Grosser's CEA claims against the moving defendants are barred by the two- and three-year statutes of limitations contained in the New Jersey and Illinois blue sky laws respectively.

### 2. RICO claims

The non-exchange defendants also contend that plaintiff's RICO claims are time-barred. Since RICO does not contain its own statute of limitations for civil actions, the same procedure followed above with regard to the CEA claims must be employed to fill the gap in the federal law. The parties apparently agree that in this situation the court must select the most appropriate limitations period provided by state law.

The very same considerations discussed above with respect to the borrowing statute require that under the circumstances of this case it be determined which New Jersey and Illinois statutes of limitations would govern plaintiff's RICO claim. A federal district court in Illinois recently considered this question as an issue of first impression. *See Electronic Relays (India) Pvt., Ltd. v. Pascente,* 610 F.Supp. 648 (N.D.Ill.1985). In *Electronic Relays* the court was guided by *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), which directed lower federal courts faced with a borrowing question involving a civil rights action under 42 U.S.C. § 1983 "to select, in each State, the one most appropriate statute of limitations for all § 1983 claims." *Id.* at 1947. In characterizing the essence of a civil RICO claim in order to select the most appropriate Illinois limitations period, the *Electronic Relays* court stated:

> Congress viewed the treble damages provision as civil RICO's most distinctive feature. That suggestion is certainly consistent with the nature of RICO. In most, if not all, RICO cases there exist state-law remedies for the same conduct that forms the basis of the RICO count. RICO's attractiveness, what sets it apart from the other available legal theories, is not the wrong but the remedy. Thus, to the extent Congress had any intent in

---

**8.** There is support for the proposition that under the "place of injury" rule a cause of action can be said to have accrued in more than one state. *See Sack v. Low,* 478 F.2d at 368.

adding the civil provisions to RICO, Congress intended the treble damages provision to provide the incentive necessary to cause private citizens to assist the government in eradicating organized crime. Therefore, this court concludes that for purposes of choosing the proper statute of limitations RICO should be characterized as a treble damages action. 610 F.Supp. at 651. The district court accordingly concluded that the most appropriate Illinois limitations period for all federal civil RICO actions is the two-year statute of limitations governing "[a]ctions for damages ... for a statutory penalty," Ill.Ann. Stat. ch. 110, ¶ 13–202 (Smith-Hurd 1984). *Id.* at 652.[9] The same statute of limitations had earlier been applied to treble-damage actions brought under the federal antitrust laws in Illinois before Congress enacted a specific federal limitations period to govern such actions. *See id.* (citing *Hoskins Coal & Dock Corp. v. Truax Traer Coal Co.,* 191 F.2d 912 (7th Cir.), *cert. denied,* 342 U.S. 947, 72 S.Ct. 555, 96 L.Ed. 704 (1951)).

█ We recognize that the result reached by the Illinois district court may at first blush appear at odds with our decision in *Fustok,* 618 F.Supp. 1076 (S.D.N.Y. 1985), that the most appropriate RICO limitations period under *New York* law was the six-year period for fraud actions rather than the three-year period for actions to recover upon a liability, penalty, or forfeiture created or imposed by statute. In the case at hand, we believe it highly appropriate to follow the determination of the federal court in Illinois: not only because that court is better situated to decide questions involving Illinois state law but also because the whole purpose of the New York borrowing statute is to take account of the statutes of limitations that would actually confront a plaintiff suing in another jurisdiction. It is precisely a federal district court in Illinois—to which such a federal RICO claim would be brought—which would decide in the first instance what

limitations period applies. These considerations did not arise in *Fustok,* a case in which we were called upon only to determine which New York statute of limitations governed. In sum, we find that the Illinois limitations period which should apply to plaintiff's RICO claims is the two-year period provided by Ill.Ann.Stat. ch. 110, ¶ 13–202.

In New Jersey the slate of decisional law is still clean on the subject of which state limitations period or periods should be applied to federal RICO actions. The non-exchange defendants argue, however, that a two-year New Jersey statute of limitations which is similar to the aforementioned Illinois law would likely be applied to RICO claims brought in New Jersey. They reason that because N.J.Stat.Ann. 2A:14–10 (West 1952), governing "actions at law brought for any forfeiture upon any penal statute," like the Illinois provision, had in the past been applied to federal antitrust claims, *see Gordon v. Loew's Inc.,* 247 F.2d 451 (3d Cir.1957), the two-year New Jersey limitations period is the most appropriate rule to apply to RICO actions as well.

The task of a federal court in New York, attempting at the direction of the forum state's borrowing statute to divine the result likely to be reached by a federal court sitting in another state after searching its own forum's law for the limitations period most appropriately applied to a federal cause of action is, to say the least, convoluted and not a little artificial. The task is further complicated by awareness that if and when the Supreme Court confronts the issue of how to borrow limitations periods for RICO actions, it may not decide (as it did with respect to Section 1983 actions) that "a simple, broad characterization of all [RICO] claims best fits the statute's remedial purpose," *Wilson v. Garcia,* 105 S.Ct. at 1945, but rather that the "choice of the correct statute of limitations [should be predicated] on an analysis of the particular

---

9. The *Electronic Relays* opinion indicated that an earlier unpublished decision in the district had also chosen the two-year period to govern civil RICO actions. *Id.* at 653 (citing *Traylor v.*

*Central States, South East and Southwest Areas Pension Fund,* Nos. 83–2206, 83–6283, slip op. at 5–6 (N.D.Ill. Nov. 6, 1984)) [Available on WEST-LAW, DCTU database].

facts of each claim," *id.* As the survey of case law conducted by the *Electronic Relays* court revealed, many courts have chosen to characterize RICO actions according to the particular facts pleaded as predicate acts. *See Electronic Relays,* 610 F.Supp. at 650–51; *see also Fustok,* 618 F.Supp. at 1080–81 ("weight of authority appears to lean in favor of the particularistic approach, at least when the gravamen of the RICO complaint is fraud").

This said, the argument for the selection of New Jersey's two-year statute of limitation is nevertheless persuasive. Both the Third and Seventh Circuit Courts of Appeals, in deciding many years ago to apply the respective New Jersey and Illinois two-year statutes of limitations to federal antitrust claims, employed virtually identical reasoning in characterizing the treble-damage remedy as the salient feature of antitrust actions and in drawing upon state court decisions which had applied the two-year limitation period to analogous state causes of action. *Compare Gordon,* 247 F.2d at 455–57, *with Hoskins,* 191 F.2d at 913–14. *Gordon* even refers, exclusively, to the similar conclusions reached by the Seventh Circuit Court of Appeals in *Hoskins* as support for its result. *See Gordon,* 247 F.2d at 457. The antitrust laws and the racketeering statute, while quite different in their genesis and elements, are nonetheless analogous in their dual criminal/civil aspects, their venue provisions, and their private treble-damage remedies. With little more to go on than this historical analogy, we find that the New Jersey limitations period which should apply to plaintiff's RICO claims is the two-year period provided by N.J.Stat.Ann. 2A:14–10.

The parties disagree on the applicable New York limitations period. Predictably, the non-exchange defendants argue for the three-year period of N.Y.Civ.Prac.Law § 214(2) (McKinney 1972), governing actions to recover upon a liability, penalty or forfeiture created or imposed by statute, while plaintiff urges the court to apply the six-year period of Section 213(8), governing actions based on fraud. However, even assuming without deciding that the plaintiff's suggestion is the more appropriate limitation period for a federal civil RICO claim brought in New York, the borrowing statute requires the application of the shorter New Jersey or Illinois limitations periods to plaintiff's RICO claims, and under either of those states' statutes of limitations, plaintiff's claims are time-barred. Thus, Grosser's RICO claims against the moving defendants are barred by the two-year limitations periods applicable under New Jersey and Illinois law.

### Personal Jurisdiction and Venue as to MACE

MACE alone among the defendants moves to dismiss the complaint for lack of personal jurisdiction and improper venue. MACE contends that it is not subject to personal jurisdiction in this state under New York's long-arm statute,[10] that the nationwide service of process provisions of the antitrust laws are of no avail to Grosser since she fails to state a claim for relief under the antitrust laws, and that, even if the court could properly exercise jurisdiction over MACE, venue does not lie in this district under any of the applicable venue statutes.

Plaintiff argues that there are four possible bases for the assertion of personal jurisdiction over MACE: (1) that MACE transacts business in New York within the meaning of N.Y.Civ.Prac.Law § 302(a)(1) (McKinney 1972 & Supp. 1986); (2) that MACE conspired with others who committed tortious acts within New York, N.Y. Civ.Prac.Law § 302(a)(2); (3) that MACE has committed tortious acts outside New York causing an injury within New York, N.Y. Civ.Prac.Law § 302(a)(3); and (4) that MACE is subject to nationwide personal

---

**10.** The parties agree that since the CEA does not provide for nationwide service of process in a private civil action, *compare* CEA § 6c, 7 U.S.C. § 13a–1 (governing injunctive actions by the Commodities Futures Trading Commission), whether personal jurisdiction exists over MACE as to the CEA claims asserted against it must be determined by reference to state laws governing the assertion of personal jurisdiction over non-domiciliaries. *See* Fed.R.Civ.P. 4(e).

jurisdiction under Section 12 of the Clayton Act, 15 U.S.C. § 22 (1982). We will consider these jurisdictional grounds in turn. Plaintiff also argues that venue in this district is proper under either Section 12 of the Clayton Act or the general federal venue statute, 28 U.S.C. § 1391(b).

According to an uncontroverted affidavit submitted by one of its officers,[11] MACE is a commodity contract market licensed by the Commodities Futures Trading Commission ("CFTC") and incorporated under the law of Illinois. Its principal place of business is Chicago, where it maintains its exclusive offices as well as the trading floor of its exchange. All trading in commodity futures takes place on the floor of the exchange and all surveillance and control over trading activities takes place in Chicago. In explaining MACE's role in commodities futures trading, the affidavit states that

> MACE acts only as a clearing house for [those who] seek to buy and sell commodity futures through the Exchange. By its rule of substitution, a rule which obtains at all commodity exchanges, MACE becomes a party to every trade on the Exchange taking the long side of every short sale ... and the short side of every long trade.... MACE itself does not buy or sell commodity futures contracts.

Andersen Affidavit at ¶ 3.

Since it is not disputed that MACE is a non-domiciliary of New York, personal jurisdiction over MACE can only be had under state law pursuant to the state's long-arm statute, N.Y.Civ.Prac.Law § 302. That statute provides in pertinent part:

> (a) *Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. Transacts any business within the state or contracts anywhere to supply goods or services in the state; or

> 2. Commits a tortious act within the state ...; or
>
> 3. Commits a tortious act without the state causing injury to person or property within the state ..., if he
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...

N.Y.Civ.Prac.Law § 302 (McKinney 1972 & Supp.1986).

### 1. Section 302(a)(1): transacting business

■ Plaintiff appears to acknowledge that MACE has never been physically present in New York either by an office, agent, employee, mailing address, telephone listing, or assets located there, *see* Andersen Affidavit at ¶ 4, but points out correctly that physical presence in the forum is not essential for jurisdiction, *see Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970). Nevertheless, before Section 301(a)(1) jurisdiction will attach,

> " 'it is essential in each case that there be some act by which the defendant purposefully avails [herself] of the privilege of conducting activities within the forum State,' thus invoking the benefits and protections of its laws...." *George Reiner and Co. v. Schwartz,* 41 N.Y.2d [648] at 651, 394 N.Y.S.2d [844] at 846, 363 N.E.2d [551] at 553 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)).

*Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 766 (2d Cir.1983). In this case plaintiff has failed to allege that MACE engaged in any, much less purposeful, activity in New York within the meaning of

---

11. Affidavit of Mary Ann Andersen, Vice President and Secretary of MACE (May 18, 1984).

Section 302(a)(1)—since there is no claim that MACE ever transacted business or contracted to supply any goods or services here. Moreover, there is no showing in this case of "the existence of some articulable nexus between the business transacted and the cause of action sued upon," *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981), since there is no indication that the futures contract purchases initiated by Grosser in New Jersey and consummated by her broker in Illinois ever had any connection with New York—with the exception of the vague allegation in the amended complaint that Merrill Lynch cleared Grosser's purchase orders through its headquarters in New York, Compl. ¶ 4.

Plaintiff contends, however, that even if the facts of this case do not fit within standard jurisdictional categories, there are strong policy reasons to assert jurisdiction over out-of-state entities whose affairs are inextricably intertwined with interstate and international commerce centered in New York. Plaintiff explains her novel theory as follows:

The business reality of the market for silver futures is that the market exists and operates as a single economic entity and like other financial markets its United States center is in New York. Electronic communications keep New York brokers and Exchanges constantly aware on a moment-by-moment basis of developments on the Chicago Exchanges, including MACE. Brokers and traders treat the various Exchanges as a single economic entity. The President of the CBOT informed Congress:

"The silver market is an international market with active cashmarkets in Lon-

don and New York and futures markets in Chicago, New York and abroad, principally London. Silver prices in all three tend to move together as there is tight worldwide arbitrage of prices." [Hearings Before the Subcomm. on Agricultural Research and Gen. Legislation, Senate Comm. on Agriculture, Nutrition and Forestry, 96th Cong., 2d Sess. 291 (1980).]

MACE derives substantial benefits from being a part of this worldwide market. Undoubtedly MACE by establishing trading in silver futures contracts has purposefully availed itself of the privilege of becoming a part of the economic entity which is the silver futures market.

MACE's participation in the silver market through its links with the New York Exchange and Clearinghouse Defendants in this case bestows upon MACE the substantial benefits associated with acting as an Exchange for trading in silver futures, and justifies the conclusion that MACE engaged in business activity in this state within the meaning of Section 302(a)(1). Since Grosser's cause of action arose as a result of silver futures trades through MACE, the assertion of jurisdiction under Section 302(a)(1) therefore is proper.

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 8–9 (footnotes omitted). *See also* Compl. ¶¶ 35–36. Plaintiff also points out that with respect to both of Grosser's trades, Merrill Lynch selected the exchange on which her contracts would be purchased, Compl. ¶ 37, and that this practice is customary. MACE Memorandum at 8 n. 14.[12]

Although plaintiff's "unitary market" theory is not without appeal, it cannot suf-

---

**12.** To plaintiff's suggestion that trading is done interchangeably on any of the three domestic commodity exchanges, MACE responds:

In 1979 and 1980 MACE had a 1,000 ounce silver futures contract whereas the COMEX silver futures contract was for 5,000 ounces. At that time because of brokerage and clearing fees it would not have been economically prudent to fill an order for 5,000 ounces silver futures with five MACE mini-silver contracts. At that time an order for a MACE size con-

tract could not have been filled on another exchange. Furthermore, at that time a MACE silver futures contract was not deliverable on the COMEX, and a COMEX silver futures contract was not deliverable on MACE.

Supplemental Affidavit of Mary Ann Andersen at ¶ 2 (Oct. 31, 1984). In light of our general conclusions below regarding the validity of plaintiff's "unitary market" theory, we do not discuss the specific factual issue of the fungibility of MACE and other futures contracts.

fice to subject MACE to personal jurisdiction in New York. In the first place, MACE is not actually a participant in the world silver market in the sense of being a purchaser or seller of futures contracts, notwithstanding its essentially mechanical clearing role in taking the other side of every trade made on the exchange. Rather, MACE performs the essentially local service (traders come to MACE to trade, even if only through an agent in the pit) of providing others with a place to trade. More importantly, however, whether MACE merely makes a market for others or itself participates in the silver trade, the unitary nature of the market as represented by the equilibration of silver futures prices in all three United States contract markets is in actuality nothing more than the result of supply and demand forces and conditions which approximate what economists call "perfect information."

Indeed, all competitive markets for goods and services will possess these characteristics in varying degrees depending on such factors as the availability of information about prices, the extent to which the commodities traded are standard, and the number of buyers and sellers in the market. Markets for agricultural commodities generally provide good illustrations of highly competitive conditions. But it would be far fetched to suggest that an onion farmer, for example [13] (or the green market that rents him a stall), is subject to personal jurisdiction in any state in which onions are bought and sold, regardless of whatever uniformity of onion prices obtains around the country, simply because he is a participant in the market. It would not seem that the ordinary consequences of market participation would result in a non-domiciliary such as MACE being characterized as having purposely availed itself of the privilege of conducting activities in a distant forum by virtue of the location there of another important marketplace. Plaintiff has cited no authority for such an extension of New York's "transacting business" concept of long-arm jurisdiction [14] and has failed to suggest any limits on her theory that would permit the exercise of personal jurisdiction within the bounds of constitutional due process.

### 2. Section 302(a)(2): tortious act committed within New York

Plaintiff acknowledges that MACE did not itself commit any tortious acts within New York but contends that MACE conspired with other defendants who did commit such acts within the state.[15] Plaintiff argues that the amended complaint sufficiently alleges MACE's participation in both the "long" conspiracy of the non-exchange defendants and the "short" conspiracy of the exchanges, or at the very least alleges facts which give rise to a reasonable inference of MACE's connection with the conspiracies.

It is established that under New York law the acts of a co-conspirator within the state may be attributed to an out-of-state defendant for the purpose of obtaining personal jurisdiction over that defendant, *Singer v. Bell,* 585 F.Supp. 300, 302 & n. 3 (S.D.N.Y.1984) (collecting cases), on the theory that the co-conspirator is carrying out activities in New York pursuant to the conspiracy. However, it is also settled that "the bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of section 302(a)(2)." *Lehigh Valley Industries v. Birenbaum,* 527 F.2d 87, 93–94 (2d Cir.1975).

---

**13.** We note in passing whimsey that the sale of onions for future delivery on United States contract markets is strictly prohibited. *See* 7 U.S.C. § 13–1 (1982).

**14.** Plaintiff's citation of *Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322 (E.D.N.Y.1981), in which Chief Judge Weinstein asserted long-arm jurisdiction over a Japanese corporation based on a finding that it transacted business in New York through its agent, a subsidiary, *id.* at

1345–47, is simply too different in fact as well as legal theory to provide guidance in the instant case.

**15.** Where antitrust violations are alleged, defendants' acts are properly characterized as tortious for the purpose of assessing personal jurisdiction. *Rios v. Marshall,* 530 F.Supp. 351, 367 n. 16 (S.D.N.Y.1981).

Instead, plaintiffs must make a *prima facie* showing of conspiracy. They must allege specific facts warranting the inference that the defendants were members of the conspiracy, and "come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York."

*Singer v. Bell*, 585 F.Supp. at 303 (Weinfeld, J.) (quoting *Socialist Workers Party v. Attorney General*, 375 F.Supp. 318, 322 (S.D.N.Y.1974)) (footnotes omitted).

 In this case plaintiff has failed to plead sufficient facts, as opposed to conclusions, that would either establish a *prima facie* case of a conspiracy involving MACE or support a reasonable inference that MACE conspired with others who engaged in tortious activity in New York pursuant to the conspiracy. An examination of the portions of the amended complaint which have some relevance to MACE's involvement in a conspiracy makes clear the defects in this regard:

The Exchanges took no affirmative action prior to or during 1979 to effectively prevent a manipulation of [the silver] market by Bunker and Herbert Hunt and those acting in concert with them. (¶ 52)

By early September 1979, the CFTC had expressed its concern with respect to developments in the silver market, and had specifically advised the Exchanges that the accounts of Nahas, BPS, Gilian, Waltuch and others were being treated as a single account for surveillance purposes. (¶ 54)

Instead of warning the less informed investing public of the dangers of the known and suspected activities of the Defendants and taking action to interdict the Defendants' actions, the Exchanges took action, including increasing margin requirements, which was designed to and did increase market volatility and, therefore, fueled price movements. (¶ 56)

Shortly thereafter in January 1980 [MACE] exercised its emergency authority and adopted similar or parallel rules to the other exchanges limiting trading in silver futures to liquidating transactions.

(¶ 60) [Comex and CBOT had adopted emergency rules in January 1980. (¶¶ 57–59) ]

The Exchanges negligently, willfully or in bad faith, and in concert, failed to take effective action to control rapidly rising silver prices even though they knew or recklessly ignored the fact that these prices were not the result of natural market forces, but were being caused by the unlawful scheme and conspiracy of the other Defendants. (¶ 63)

During [the] period [September 1979–January 1980] the governing boards of the Exchanges met and considered the rules for trading in silver futures, and although periodically revising the rules through 1979, did not take decisive action until January 1980, when they instituted position limits and instituted liquidation only rules. (¶ 67).

[Some] Exchange members [on the governing boards of Defendant Exchanges] held short positions at times relevant to this action, and having been damaged by the rise in the price of silver futures contracts through January 20, 1980, individually and in concert, acting through the Exchanges, sought to reverse such rise and cause the price of silver futures contracts to drop, to allow them to realize substantial profits and prevent them from facing impending bankruptcy. (¶ 71)

The conduct of the Exchanges and their governing boards individually and in concert, artificially influenced the price of silver ... to the detriment of the Plaintiff and the public interest, and in favor of the short Exchange members. (¶ 73)

Defendant Clearinghouses, individually and in concert with the Exchanges, and members of the Exchanges, facilitated, participated in and caused and maintained price manipulation, and restraint of trade.... (¶ 77)

Defendant Exchanges and Clearinghouses concealed the facts and information alleged above and performed acts and made statements in furtherance of

the concealment and other illegal acts alleged herein. (¶ 78)

The balance of the amended complaint either summarizes the preceding paragraphs or states a legal claim in conclusory terms, using ambiguous phrasing such as "acting in concert" (claims under CEA §§ 4b and 4c) (¶ 88) or "acting in concert, and in combination with each other, engaged in a conspiracy" (claims under Sherman Act § 1) (¶ 90).

The problem with the amended complaint is not that it fails to plead the commission of tortious acts by others within New York. The flaw lies rather in the absence of any direct allegations (other than in the form of non-specific legal conclusions) that MACE agreed either: (1) with the non-exchange defendants and others to cooperate in the long conspiracy; (2) with the other exchanges not to take action to stem the long conspiracy; or (3) with the other exchanges to participate in the short conspiracy. In fact, it is not clear from the amended complaint whether the plaintiff herself believes there was one long conspiracy which involved both the non-exchange defendants (and others) and the exchanges (and clearinghouses) or a separate conspiracy among the exchanges themselves to facilitate the long conspiracy by the non-exchange defendants—if either. And neither does the amended complaint make clear whether the plaintiff believes the exchanges conspired with each other to achieve the ends of the short conspiracy or merely that certain members of each exchanges' governing board conspired with each other (or with certain members of the other exchanges' governing boards) to bring about the short conspiracy. Even for purposes of notice pleading, this will not do.

In concluding that plaintiff has failed sufficiently to allege conspiracy by MACE with New York actors, we are aware that a conspiracy can rarely be proved by direct evidence, and is instead "usually established by circumstantial evidence based upon independent proof of each alleged co-conspirator's acts, conduct and statements and the totality of conduct of all the participants and the reasonable inference to be drawn therefrom."

*Singer v. Bell,* 585 F.Supp. at 303 (quoting *United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962)). We have recognized elsewhere that "[t]he lack of an express allegation of an agreement is not fatal to [a] plaintiff['s] conspiracy claims. The courts have held that disconnected acts, when taken together, may satisfactorily establish a conspiracy...." *First Federal Savings and Loan Association v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 443 (S.D.N.Y.1986) (common law conspiracy). Nevertheless, the amended complaint is so short of specific facts and so unclear as to its theory of any conspiracy involving MACE as to fail to meet even the looser standards applied to the pleading of conspiracy. *See Levitch v. Columbia Broadcasting System,* 495 F.Supp. 649, 675 (S.D.N.Y.1980) (antitrust claims), *aff'd,* 697 F.2d 495 (2d Cir.1983) (per curiam).

The conclusion that the amended complaint fails to plead sufficient facts to support a jurisdictional finding of conspiracy is related to a determination of whether the plaintiff adequately states a claim under the antitrust laws against the exchanges generally. Plaintiff charges all defendants with a *per se* violation of Section 1 of the Sherman Act—conspiracy to restrain trade in silver (Compl. ¶ 90)—and a violation of Section 2 of the Sherman Act—attempt to monopolize trade in silver (Compl. ¶ 93). As against the exchanges, who are not actual competitors in the silver market, we agree with Judge McMahon that an exchange "cannot monopolize or attempt to monopolize the market and, thus, [the Section 2 claim] can be understood as charging the Exchange[s] only with conspiring to monopolize." *Strobl v. New York Mercantile Exchange,* 561 F.Supp. 379, 383 n. 5 (S.D.N.Y.1983). Consequently, conspiracy is an essential element in both antitrust claims against the exchanges, including MACE.

To the extent both claims pertain to the exchanges' purported participation in the long conspiracy, we believe our holding in

*Minpeco, S.A. v. ContiCommodity Services, Inc.,* 552 F.Supp. 327 (S.D.N.Y.1982), to be applicable here:

> [I]t is unclear whether Minpeco means to charge that the exchanges' alleged failure to carry out their duties simply permitted the remaining defendants to proceed with their conspiracy, or whether the exchanges are alleged to have neglected their duties *for the purpose of participating* in the conspiracy. Even if the exchanges had neglected their duties out of bad faith, that is, out of a desire to injure plaintiff, that alone would not make them participants in a conspiracy. Conspiracy requires agreement, and it is far from clear that the complaint alleges the exchanges to have conspired with anyone.

*Id.* at 331–32 (failure to sufficiently plead conspiratorial intent) (emphasis in original); *but see Strobl,* 561 F.Supp. at 383 ("tacit agreement is sufficient to show a conspiracy in violation of the Sherman Act, and it may be established by the conduct of the parties"; "acquiescence may supply the intent necessary to a finding of conspiracy").

To the extent the Section 1 claim pertains to the exchanges' alleged short conspiracy, it is also insufficient to state a claim without a clearer explanation of precisely who is alleged to have conspired and some facts from which at least tacit agreement by the exchanges to take concerted action may be

inferred. The need for more than scatter-shot pleading of antitrust violations is particularly important in a situation such as this in which the actions taken by the exchanges in alleged furtherance of the short conspiracy (*e.g.,* imposition of "liquidation only" rules) are consistent with the remedial actions contract markets are permitted to take in emergency circumstances under the CFTC's regulations, *e.g.,* 17 C.F.R. § 1.41(f)(3)(i) (1980) (authorizing liquidation only rules), and in which there are legitimate reasons for frequent communication among the alleged conspirators.[16]

■ Normally, evidence of conspiracy must await discovery, particularly where the conduct alleged is market manipulation—presumably involving clandestine activities the knowledge of which would be within defendants' exclusive control. *See Rooney Pace, Inc. v. Reid,* 605 F.Supp. 158, 162–63 (S.D.N.Y.1985). And the Court of Appeals for the Second Circuit has held, in a case where the plaintiff had put forward detailed allegations and submitted evidentiary facts by affidavit tending to connect the defendant to New York transactions, that narrow jurisdictional fact questions should not be resolved and the complaint dismissed without further discovery. *See Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1343–44 (2d Cir.1972).

**16.** The Supreme Court recently described the general problem of distinguishing concerted from unilateral action in ruling on a challenge to the evidence after trial in a case involving a claimed vertical price-fixing conspiracy:

> [T]he economic effect of … the conduct described above—unilateral and concerted vertical price setting …—is in many, but not all, cases similar or identical. And judged from a distance, the conduct of the parties in the various situations can be indistinguishable. For example, the fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market.
> ….

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 762, 768, 104 S.Ct. 1464, 1470, 1472, 79 L.Ed.2d 775 (1984) (citations omitted). Although the Court was writing in a different legal context about the proper standard of proof, not a pleading standard, its analysis is nevertheless instructive. *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 1353, 89 L.Ed.2d 538 (1986) (considering "whether it was as plausible to conclude that [defendant's] price-cutting behavior was independent and not conspiratorial").

In this case, however, the court is not faced with a narrow fact question that will determine personal jurisdiction but rather with seriously insufficient allegations of conspiracy. Moreover, discovery of MACE on the issue of conspiracy for jurisdictional purposes would conceivably occupy the same wide field as full-blown discovery on the merits of the case. We agree with Judge Griesa that:

> To compel a defendant to remain in an action during discovery and other pretrial proceedings, and participate in such proceedings, is an assertion of jurisdiction to some extent—and no trivial burden in a substantial case. Surely a plaintiff must make some specific factual showing in order to assert such jurisdiction. A plaintiff cannot be permitted to effect service of process on an out-of-state defendant on the mere basis that such plaintiff hopes somehow and somewhere to find enough facts to create grounds for jurisdiction.

*Socialist Workers Party*, 375 F.Supp. at 325. We thus conclude that there is a "threshold failure" here to establish any basis for a finding that MACE conspired with others who committed tortious acts within New York. *Lehigh Valley Industries*, 527 F.2d at 94.

3. Section 302(a)(3): tortious act committed outside New York causing injury within the state

 In order for plaintiff to found jurisdiction upon Section 302(a)(3), it is necessary to show that MACE's alleged tortious acts—assumedly activities in Illinois—caused an injury within New York. It is now apparently the law that the situs of a non-physical, commercial injury such as the financial loss Grosser suffered in this case is for § 302(a)(3) purposes the place "where the critical events associated with the dispute took place." *Weiss v. Greenburg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff*, 85 A.D.2d 861, 862, 446 N.Y. S.2d 447, 449 (3d Dept. 1981) (citing *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433 (2d Cir.1971)); *accord Faherty v. Fender*, 572

F.Supp. 142, 149 & n. 10 (S.D.N.Y.1983) (collecting cases).

Plaintiff contends that under this rule the place of injury is New York, since, according to her, the critical events associated with "the conspiracy" took place here. Absent sufficient allegations of MACE's conspiracy with New York actors, however, it is not possible to connect MACE's Illinois activities to New York so as to permit a finding that the critical events associated with *MACE*'s conduct took place in New York. In addition, because plaintiff's "unitary market" theory has already been considered and rejected above, New York's relationship to the silver futures market cannot be argued to locate the situs of Grosser's injury within the meaning of Section 302(a)(3) in this state.

\* \* \*

Consequently, this court cannot assert personal jurisdiction over MACE under either of the first three sections of New York's long-arm statute.

4. Section 12 of the Clayton Act

 Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (1982). By the authorization in its second clause of out-of-state or extraterritorial service of process, Section 12 is construed as conferring nationwide personal jurisdiction over corporate antitrust defendants. *General Electric Co. v. Bucyrus-Erie Co.*, 550 F.Supp. 1037, 1038 (S.D. N.Y.1982). In order to utilize the antitrust statute's personal jurisdiction provision, however, a plaintiff must establish that venue as to its antitrust claim lies in the district in which suit is brought. The question presented, then, is whether venue as to

MACE is proper in the Southern District of New York.

Venue in this district may be authorized under either Section 12 itself or under the general federal venue provisions of 28 U.S.C. § 1391(b), since the weight of authority now holds that the provisions of the general venue statute are supplemental to—not superseded by—the special antitrust venue statute. *General Electric,* 550 F.Supp. at 1040 & n. 3, 1042; *Bamford v. Hobbs,* 569 F.Supp. 160, 169–70 (S.D.Tex. 1983) ("deemed to be proper result by the majority of courts"). *See also Albert Levine Associates v. Bertoni & Cotti,* 314 F.Supp. 169 (S.D.N.Y.1970) (holding that § 1391(b) supplements specific venue sections of Clayton Act). Section 1391(b) provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

28 U.S.C. § 1391(b) (1982). Thus, venue as to plaintiff's suit against MACE is proper in this district if MACE is an inhabitant, is found, or transacts business here, if the claim against MACE arose here, or if all named defendants reside here.[17]

Plaintiff suggests that under its "unitary market" theory MACE can be considered to transact business in New York. The Supreme Court has defined "transact business" for venue purposes as importing the "practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.'" *United States v. Scophony Corp.,* 333 U.S. 795, 807, 68 S.Ct. 855, 861, 92 L.Ed. 1091 (1948). We think such a meaning requires at least as much as the "transacting business" prong of N.Y.Civ.Prac.Law § 302(a)(1), which we have already found is not satisfied as to MACE in this case. *See*

*Agra Chemical Distributing Co. v. Marion Laboratories, Inc.,* 523 F.Supp. 699, 702 (W.D.N.Y.1981) (finding the concepts co-extensive).

Plaintiff further contends, however, that her "claim arose" in New York within the meaning of 28 U.S.C. § 1391(b). She asserts that a cause of action for venue purposes can be said to arise wherever material events took place, that the purpose of the venue provisions is simply to allocate suits to the most convenient forum, and that MACE is the only defendant to challenge venue in New York.

The Supreme Court examined Section 1391(b) in *Leroy v. Great Western United Corp.,* 443 U.S. 173, 183–87, 99 S.Ct. 2710, 2716–18, 61 L.Ed.2d 464 (1979). Without setting out a formula for determining where a "claim arose," the Court stated that "[i]n most instances, the purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Id.* at 183–84, 99 S.Ct. at 2716 (footnote omitted) (emphasis in original). On the other hand, the Court in a footnote appeared to adopt the suggestion from one of its earlier cases that the "claim arose" language was added to the venue statutes in 1966 because Congress wanted to close the "venue gap" that sometimes confronted *plaintiffs* in situations where multiple defendants could not be sued jointly because they resided in different districts. *Id.* at 184 & n. 17, 99 S.Ct. at 2717 & n. 17. Then, without deciding whether Section 1391(b) permits suit in more than one district, *id.* at 184–85, 99 S.Ct. at 2716–17, the Court stated:

[T]he broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or con-

---

**17.** The Clayton Act's general venue section, Section 4, 15 U.S.C. § 15, which is applicable to individual as well as corporate defendants, may in theory be read in conjunction with Section 12 and the general venue statute in determining whether venue is proper as to a given defend-

ant; however, the courts have read Section 12 as broader in scope than Section 4, so this is not necessary. *See Pocahontas Supreme Coal Co. v. National Mines Corp.,* 90 F.R.D. 67, 69 (S.D.N.Y. 1981); *Wood v. Santa Barbara Chamber of Commerce,* 507 F.Supp. 1128, 1141 (D.Nev.1980).

ceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)—may be assigned as the locus of the claim.

*Id.* at 185, 99 S.Ct. at 2717 (footnote omitted) (emphasis in original). The Court stated, however, that in the usual case the place where the actions occurred that provide the basis for the claim will point to one obvious locus. *Id.* at 185–86, 99 S.Ct. at 2717–18. In the usual case, then, the Court seemed to suggest that lower courts look to the district where the significant acts and omissions by the defendants give rise to liability, an approach not radically different from the "weight of the contacts" method employed by courts in this district prior to *Leroy* to select the district with which the defendant's contacts were most significant. *See, e.g., Ghazoul v. International Management Services,* 398 F.Supp. 307, 314–15 (S.D.N.Y.1975).

Application of *Leroy* to the present case is not easy because of the questions that decision leaves unanswered. *Accord Cheeseman v. Carey,* 485 F.Supp. 203, 213 (S.D.N.Y.) (Sofaer, J.), *remanded on other grounds,* 623 F.2d 1387 (2d Cir.1980). If venue of plaintiff's action is to lie in only one district, we would agree with plaintiff that the Southern District of New York is probably the place where most of the defendants' acts giving rise to liability occurred and which would be most convenient for the greatest number of named defendants and likely witnesses. On the other hand, it cannot be ignored that the amended complaint charges that massive wrongful actions and serious omissions also took place in the Northern District of Illinois and that four of the five exchange defendants—who are alleged to have participated in both the long and short conspiracies—are located there. Consequently, this seems to fit the description of the Supreme Court's "unusual case" in which the claim arose in more than one district.

If the foregoing question posed the only problem in this case, we would simply find at this early stage of the litigation that venue was proper in both districts. The added difficulty is posed by the conflict between the Supreme Court's admonition that the purpose of venue is to protect the defendant against plaintiff's selection of an unfair or inconvenient place of trial and the Court's implication that the purpose of the "claim arose" language is to close the venue gap. No doubt the "claim arose" language will in many cases bring all defendants together in one forum without subjecting any to unfairness or inconvenience. In this case, however, a finding that venue lies as to MACE in this district will, while closing any venue gap, subject it to suit here under the nationwide personal jurisdiction provision of the Clayton Act. At the same time, absent sufficient allegations of MACE's involvement in either of the conspiracies suggested by plaintiff, all of MACE's acts or omissions giving rise to liability—as well as its likely witnesses and evidence—will be situated in Illinois. We therefore conclude that venue as to MACE does not lie in this district.

There is support for this conclusion in the *Leroy* opinion itself—although it does for the time being create a venue gap in that all named defendants cannot be sued in the same district. There, the Supreme Court recognized that although "consolidating similar claims in a single proceeding" was often desirable for defendants as well as plaintiffs, there was a difference between cases involving "multiple defendants who contributed to a single injurious act" and the case then at hand in which the plaintiff had "attempted to join in one suit three separate claims ... against three sets of defendants from three states." 443 U.S. at 184 & n. 17, 99 S.Ct. at 2716 & n. 17. Of the latter the Court stated: "The statute simply does not contemplate such a choice on the part of plaintiffs." *Id.* Since plaintiff has failed sufficiently to allege MACE's involvement in a conspiracy with the other defendants, we find that the claims against it are essentially "separate"

from those asserted against the other defendants.

In sum, because venue as to MACE does not lie in this district, personal jurisdiction cannot be asserted over it by means of the nationwide service of process provision of Section 12. In the alternative, because plaintiff has failed sufficiently to allege MACE's participation in a conspiracy so as to state a claim for relief under Sections 1 and 2 of the Sherman Act, the nationwide personal jurisdiction provision of the antitrust laws is unavailable to confer jurisdiction over MACE whether or not the venue requirements of 28 U.S.C. § 1391(b) have been satisfied as to MACE.

\* \* \*

Accordingly, MACE's motion to dismiss the complaint against it for lack of personal jurisdiction is granted.

Personal Jurisdiction Over Brodsky

Brodsky moves to dismiss the claims asserted against him for lack of personal jurisdiction on the ground that service of the summons and complaint upon him was defective. Brodsky does not otherwise contend that he is not subject to personal jurisdiction in this court.

It appears from the memoranda submitted by the parties that plaintiff attempted without success to serve process upon Brodsky at his place of business in New York before mailing the summons and complaint to Brodsky's residence in Florida. Enclosed with the summons and complaint was a notice stating that service was being made pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii). Brodsky admits he received the summons and complaint and returned an acknowledgement of service.

Brodsky contends that service by mail pursuant to Rule 4(c)(2)(C)(ii) beyond the territorial limits of the forum state is improper, that extraterritorial service of process can only be effected if authorized under state law, and that such extraterritorial mail service as was employed in this case is not permitted by the applicable New York law. Plaintiff responds that she made good faith efforts to serve Brodsky in New York, that he avoided service, and that since he admits receiving actual notice of the commencement of the action any defect in manner of service is merely technical and does not warrant dismissal.

In the leading case on this subject, Judge Owen of this district confronted a situation strikingly similar to that presented here. *See William B. May Co. v. Hyatt*, 98 F.R.D. 569 (S.D.N.Y.1983). Construing the 1983 amendment to Rule 4 that added subsection 4(c)(2)(C)(ii), Judge Owen wrote:

> The legislative history of Fed.R.Civ.P. 4(c)2(C)(ii), which authorizes service by mail in federal litigation, makes it clear that this subsection is subject to the territorial restrictions imposed by Fed.R. Civ.P. 4(f) [See Cong.Rec. H9855 (daily ed. Dec. 15, 1982), reprinted at 96 F.R.D. 81, 128.] As with all other methods of service, service by mail is prohibited beyond the borders of the state in which the action is brought unless such extraterritorial service is authorized "by a statute of the United States or by these rules." Plaintiff does not contend that any federal statute authorizes mail service on defendants in the instant action. Such service must therefore be authorized by one of the Federal Rules of Civil Procedure. The only possible authorization for extraterritorial service by mail is contained in Rule 4(e) which provides that:
>
> > Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state ... such service may ... be made under the circumstances and in the manner prescribed in the statute or rule.
>
> However, service here has no support under New York law. New York Civ. Prac.R. 308, which sets forward the five methods of effecting service upon individuals in New York, does not provide for service by mail.

98 F.R.D. at 570. Subsequent decisions by courts in this circuit have been in precise

agreement with Judge Owen's conclusions. *See Catalyst Energy Development Corp. v. Iron Mountain Mines*, 108 F.R.D. 427, 428 (S.D.N.Y.1985) (MacMahon, J.); *Olympus Corp. v. Dealer Sales & Service, Inc.*, 107 F.R.D. 300, 303–305 (E.D.N.Y.1985) (Glasser, J.); *Daley v. ALIA*, 105 F.R.D. 87, 89 (E.D.N.Y.1985) (McLaughlin, J.).

There is no doubt that plaintiff's mail service on Brodsky in Florida is not authorized under either Rule 4(c)(2)(C)(ii) or N.Y. Civ.Prac.L. 308 (McKinney Supp.1986). The only remaining question is what significance to attach to the fact that Brodsky concedes he acknowledged receipt of service and had actual notice of the lawsuit.

Judge Owen also confronted this question in *Hyatt*, where the defendant had, like Brodsky, returned the acknowledgement of service form. Judge Owen found that the compelling tone of the form's language (which substantially duplicated that of sample form 18–A appended to the Federal Rules of Civil Procedure) made it likely "that parties receiving it would feel required to complete and return it whether they believed—or even knew—that there was a valid objection to the manner of service or not." 98 F.R.D. at 571. Judge Owen concluded that the references to "penalty of perjury" and payment of costs incurred by plaintiff, which the form explained would be attendant upon a failure to return the acknowledgement, made it "inappropriate to treat mere return of the form as a waiver of any objections to the manner of service in cases for which service is not authorized." *Id.* We agree that return of the acknowledgement in and of itself does not constitute a waiver of the right to object to the sufficiency of process.

As to the significance of Brodsky's actual notice, the Court of Appeals for the Second Circuit has held:

> Absent a waiver, Rule 4 mandates that the defendant be served with the summons and complaint personally, or in accordance with one of several prescribed alternatives. A showing that the defendant has had actual notice of the lawsuit is not sufficient to bar a motion to dismiss under Rule 12(b)(2). *See Di Leo v. Shin Shu*, 30 F.R.D. 56 (S.D.N.Y.1961); 2 *Moore's Federal Practice* ¶ 4.11[1], at 4–115 to 4–116 (2d ed. 1978).

*Martin v. New York State Department of Mental Hygiene*, 588 F.2d 371, 373 (2d Cir.1978) (per curiam).

Consequently, while we are reluctant to dismiss a complaint in a situation in which the putative defendant has not suffered actual prejudice, the Court of Appeals has long maintained the position that failure to comply with the basic terms for service of process will deprive a court of jurisdiction.

> The standards set in Rule 4[ ] for service on individuals and corporations are to be liberally construed, to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice. But there must be compliance with the terms of the rule, and absent waiver, incomplete or improper service will lead the court to dismiss the action unless it appears that proper service may still be obtained.

*Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir.1972) (citations omitted). *See also American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118, 126 (2d Cir.1979) ("Although the answer was indeed mailed to [defendant] in Florida, ... he does not appear to have been served in accordance with any of the procedures enumerated in Fed.R.Civ.P. 4.... In the absence of proper service, the District Court had no *in personam* jurisdiction over [defendant] to adjudicate the cross claim asserted against him.")

Accordingly, Brodsky's motion to dismiss for lack of personal jurisdiction is granted.

### Antitrust Claims

#### 1. Exchange defendants

In view of the conclusion reached above (in connection with the discussion of personal jurisdiction over MACE) that the complaint fails sufficiently to allege facts or define a theory of a conspiracy involving the exchanges and clearinghouses which would support the antitrust claims of re-

straint of trade and monopolization, those claims are dismissed as against the exchange defendants.[18]

### 2. Non-exchange defendants

The non-exchange defendants make a number of arguments that can be subsumed under the heading of challenges to Grosser's standing to bring her antitrust claims. They argue that plaintiff does not have standing under Section 4 of the Clayton Act because: (a) the activities engaged in by the non-exchange defendants, even if in violation of the Sherman Act, could only have benefited her; (b) that her injury is too remote from and incidental to the alleged antitrust violations by the non-exchange defendants; (c) that granting plaintiff standing to sue the non-exchange defendants would result in antitrust "overkill"; and (d) that plaintiff did not suffer "antitrust injury" because the actions causing the drop in silver prices that actually caused her losses were "procompetitive" in nature.

Two recent Supreme Court decisions have addressed the subject of limitations on the availability of treble damages under Section 4 of the Clayton Act, which in broad language confers a cause of action on "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). *See Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

*McCready* discussed two types of limitation. The first was designed to deny standing to an antitrust plaintiff in situations which presented "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust law." 457

U.S. at 474–75, 102 S.Ct. at 2545–46. The second would deny standing to plaintiffs whose injuries were too remote from the alleged antitrust violation. In applying the "remoteness" limitation, which the Court likened in its elusiveness to the common law concept of "proximate cause," courts must look

> (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

*Id.* at 478, 102 S.Ct. at 2547.

In *General Contractors* the Supreme Court focused on a number of factors— some overlapping with the limitations discussed in *McCready*—to be analyzed in deciding the standing issue. These included: (1) a causal connection between the alleged antitrust violation and the harm to the plaintiff, and the defendant's intention to cause that harm; (2) the relationship of the injury to the statute's goal of protecting the economic freedom of participants in the market—specifically, whether plaintiff was a consumer or competitor in the relevant market; (3) the directness of the injury; (4) whether there exists an identifiable class of persons apart from the plaintiff whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (5) the speculative nature of the damage claim; and (6) the potential difficulties in computing damages posed by the need to avoid duplicative recovery or complex apportionment among injured parties. 459 U.S. at 535–45, 103 S.Ct. at 907–12. *See also Crimpers Promotions Inc. v. Home Box Office, Inc.,* 724 F.2d 290 (2d Cir.1983) (applying *McCready* and *General*

---

**18.** Although in their memorandum in support of the motion to dismiss the exchange defendants challenged the antitrust claims based on the amended complaint's failure adequately to allege participation in and intent to further only the *long* conspiracy, in their presentation at oral argument the exchange defendants directly challenged the sufficiency of the plaintiff's allegations with respect to the *short* conspiracy as well. *See* Transcript of Oral Argument at 23–25 (Dec. 20, 1985).

*Contractors* standing factors), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).

■ Under either the *McCready* or *General Contractors* analysis, we believe plaintiff has standing to bring her antitrust claims against the non-exchange defendants. Rather than engage in a factor-by-factor analysis, however, we consider in turn the specific arguments advanced by the non-exchange defendants.

### a.

The non-exchange defendants first argue that Grosser, as a holder of long positions in the silver futures market, stood to benefit from a rise in the price of futures contracts. They reason that to the extent that the non-exchange defendants succeeded in monopolizing the market and artificially causing the price of silver to rise—to the detriment of those holding short positions —Grosser, who was on the same side of the market as the non-exchange defendants, could only have benefited from such activity. The non-exchange defendants contend that Grosser only suffered injury later, as the result of actions taken by other defendants to depress the price of silver futures contracts, and that any losses she suffered at that time were also sustained by the non-exchange defendants. This coincidence of economic interest, they argue, makes it clear that there was no significant causal relationship between the non-exchange defendants' alleged antitrust violations and Grosser's injury.

What the foregoing argument ignores, however, is that as a direct result of the non-exchange defendants' alleged market manipulation Grosser *purchased* her futures contracts at an artificially inflated price. She paid too much for the product—a futures contract—in the relevant market—the market for silver futures. The fact that plaintiff's economic interests and those of the non-exchange defendants may have been linked for a time (the period following Grosser's purchases) cannot obscure the fact that she paid prices for her contracts that apparently far exceeded their true value, or the value the market would have attached to them absent the alleged manipulation. And it is the inflated price paid for her contracts that is part and parcel of the injury she suffered when she liquidated her positions at a loss.

Admittedly, antitrust suits by "long" plaintiffs against "long" defendants may complicate the calculation of damages—one of the *General Contractors* factors—because plaintiffs and defendants would not hold offsetting positions in the market. *See de Atucha v. Commodity Exchange, Inc.,* 608 F.Supp. 510, 516 (S.D.N.Y.1985). Nevertheless, a case involving plaintiffs and defendants on the same side of a commodities market would not be without precedent. *Id.* at 516 n. 19 (citing *Leist v. Simplot,* 638 F.2d 283, 290–91 (2d Cir.1980) (potato futures), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)). Moreover, while the nature of the injury plaintiff suffered in this case as the result of the alleged long conspiracy is distinguishable from the kind of injury that might have been sustained by a trader holding a short position in the market at the same time, *compare, e.g., Pollock v. Citrus Associates,* 512 F.Supp. 711, 718–19 (S.D.N.Y.1981), the distinction does not in itself deprive plaintiff of standing.

### b.

The second argument advanced by the non-exchange defendants is that plaintiff's injury is simply too remote from the alleged antitrust violations to be cognizable under the antitrust laws. The heart of the argument is that rather than the alleged price-inflating activities of the non-exchange defendants, it was the price-deflating activities of the exchanges which directly caused plaintiff's injuries. The conspiracy by the non-exchange defendants, it is asserted, was no more than a "but for" cause of plaintiff's injuries. The non-exchange defendants also make the related argument that because the alleged long conspirators sought to "squeeze the short traders," injuries to longs such as Grosser

were incidental rather than "central to the attainment of the anticompetitive objective." *Litton Systems, Inc. v. American Telephone and Telegraph Co.,* 700 F.2d 785, 821 (2d Cir.1983) (citing *Schwimmer v. Sony Corp.,* 637 F.2d 41, 48–49 (2d Cir. 1980)), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). Finally, the non-exchange defendants contend that the speculative and complex nature of the claimed damages supports the conclusion that plaintiff's injury is remote.

The problem with the argument that the alleged activities of the non-exchange defendants were merely a "but for" cause of plaintiff's ultimate injury from the fall in the price of silver is that it ignores the fact the plaintiff bought into the market at an artificially inflated price. The conclusion would be different, it would seem, had plaintiff merely been induced to purchase silver futures at a naturally competitive level and later suffered a loss when the price of silver fell. But that is not this case. Here, the magnitude of plaintiff's losses, if not the very potential for those losses, was directly determined by the actions allegedly taken by the non-exchange defendants to boost the price of silver futures.

As to the related argument that the injury to plaintiff was merely incidental, rather than central, to the attainment of the purported long conspirators' objectives, *McCready* teaches that "the availability of the § 4 remedy is not a question of the specific intent of the conspirators." 457 U.S. at 479, 102 S.Ct. at 2548. In this case inflating the price of silver and silver futures was the very essence of the alleged long conspiracy and it was certainly foreseeable that some innocent traders would take long positions as silver prices rose. Although purchases by traders in Grosser's position were not theoretically necessary to the effectuation of the non-exchange defendants' alleged scheme (in theory, they would assumedly have preferred to have purchased all outstanding futures contracts and silver stocks themselves—thus achieving a perfect corner), we think it fair to say that the injury she suffered was "inextricably intertwined with the injury the conspirators sought to inflict on [short traders] and the [silver futures] market." *Id.* at 484, 102 S.Ct. at 2551. Given a market like that in silver futures which under normal competitive conditions relies on the willingness to trade of numerous, similarly situated purchasers and sellers of contracts, it would seem highly artificial to characterize as incidental the injuries suffered by innocent purchasers when the market is manipulated by a conspiracy of purchasers to the point where prices bear no relation to normal levels, simply because the specific goal of the manipulators was to profit from sellers.

Furthermore, it is relevant to the *McCready* "remoteness" inquiry that there is no question in this case that the injury of a purchaser in a severely manipulated national commodities market where competitive conditions have all but broken down was

> of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws. [Grosser] charges [the non-exchange defendants] with a purposefully *anti-competitive* scheme. She seeks to recover as damages the sums lost to her as the consequence of [the non-exchange defendants'] attempt to pursue that scheme.

*McCready,* 457 U.S. at 483, 102 S.Ct. at 2550 (emphasis in original).

The non-exchange defendants also contend, as part of their remoteness argument, that damages are too speculative and would pose excessively complex problems of calculation. As to whether damages are too speculative, we do not believe this case presents a situation significantly different from that in other silver cases where standing has been recognized, such as *Pollock, supra* and *Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936 (S.D.N.Y.1981). In all these cases there are "extraneous factors" apart from the alleged conspiracies which affect price movements. And Grosser's is not a claim which rests on

"some abstract conception ... of harm." *General Contractors*, 459 U.S. at 543, 103 S.Ct. at 911 (quoting *McCready*, 457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11).

As mentioned above, the concern with keeping the complexity of judicial determinations of damage recoveries within manageable limits, *General Contractors*, 459 U.S. at 543–45, 103 S.Ct. at 911–12, is a separate factor to be considered. That plaintiff in this case was on the same side of the market as the non-exchange defendants and that other actors in the market are alleged to have been responsible in part for plaintiff's damages will both complicate the calculation of damages. However, the concern of the *General Contractors* Court was with computation problems posed by the need to avoid duplicative recovery and complex apportionment of damages among injured parties, while the potential problems in this case relate to the magnitude of recoverable damages and apportionment of liability among various groups of defendants. In addition, notwithstanding its complexity, this case is still distinguishable from commodities cases in which plaintiffs were denied antitrust standing. *See, e.g., Reading Industries Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir.1980) (involving two separate product markets—refined copper and scrap—and requiring analysis of various types of market participants and interactions), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *de Atucha*, 608 F.Supp. at 517 (requiring the tracing of price effects on both domestic and foreign silver markets). Consequently, although the complexity of damage calculations in this case could turn out to be substantial, the situation presented is not so extraordinary as to justify a denial of standing on that ground alone.

c.

The third argument asserted by the non-exchange defendants is that granting plaintiff standing to bring her antitrust claims against the alleged long conspirators is not necessary to the effectuation of antitrust enforcement, because those who held short positions in the silver futures market have already been granted standing in other cases to sue the non-exchange defendants and the plaintiff herself may still pursue her damage claims against the alleged short conspirators. The non-exchange defendants contend that since short traders are the "identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," *General Contractors*, 459 U.S. at 542, 103 S.Ct. at 910, denying plaintiff and other long traders a remedy against the purported long conspirators under these circumstances would not leave an antitrust violation unremedied. Extension of the remedy to plaintiff and others similarly situated would, they contend, result in antitrust "overkill."

Both aspects of this argument are problematic. First, it is not at all clear that plaintiff has a cause of action against other defendants for violations of the antitrust laws. Moreover, it is a logical extension of plaintiff's theory of the case that she would have suffered a compensable loss even if silver futures prices fell from artificially high levels without the aid of a conspiracy by shorts to depress prices. Second, distinguishing long from short plaintiffs with respect to their right to recover their losses would not seem warranted simply because the way in which their losses accrued is different, where their injuries are distinct and not duplicative (as they might be in a "chain of distribution" situation, *see, e.g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)) and they are competitors at the same level in the same market. Short traders as an identifiable class are not in any significant way more suitable antitrust plaintiffs than long traders, even if a determination that only one group has standing to sue will not frustrate the goal of private enforcement of the antitrust laws.

Nor is it apparent that granting plaintiff standing to sue will result in antitrust "overkill" by making the non-exchange defendants insurers of all losses in the market. We agree with plaintiff that there would be nothing inimical to the antitrust

laws about short and long traders both recovering their losses, even if the same trader suffered losses on short and long contracts during different periods.

d.

The fourth and final argument advanced by the non-exchange defendants is that the drop in silver prices to normal levels that plaintiff alleges was directly caused by the manipulative conduct of the exchanges cannot give rise to an injury of the kind the antitrust laws were intended to prevent, since the latest acts in the causal chain leading to plaintiff's losses were procompetitive in effect. The non-exchange defendants rely on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), for the proposition that antitrust plaintiffs

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 489, 97 S.Ct. at 697 (emphasis in original).

The response to this argument is twofold. First, as discussed at length above, the injury plaintiff suffered—losses on contracts purchased at artificially high prices that were incurred when silver futures prices subsequently declined—did reflect the anticompetitive effect of the alleged antitrust violations by the non-exchange defendants. Plaintiff's losses were inextricably intertwined with the anticompetitive acts. In *Brunswick* the plaintiffs were bowling centers which sought to recover damages for profits lost when competing centers, instead of going out of business and thereby leaving to plaintiffs a greater share of the market, were instead acquired and operated by a bowling equipment manufacturer in apparent violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, which proscribes mergers whose effect may be to lessen competition or tend to create a monopoly. The Supreme Court found that even though a violation of Section 7 was made out, plaintiffs' injuries resulted from the preservation of competition rather than its elimination, and they thus suffered no cognizable antitrust injury. *See Brunswick*, 429 U.S. at 487–89, 97 S.Ct. at 696–97. In the instant case, there was nothing procompetitive about the non-exchange defendants' alleged actions. And plaintiff's argument with respect to the non-exchange defendants is not that she would have been better off if the price of silver had never crashed in January 1980 (though that is undoubtedly true), but rather that she would have been better off had she never entered the futures market on the long side at all.

The other side of the response to the non-exchange defendants' argument is that whether or not the alleged actions of the exchanges were "procompetitive in effect" presents a question of fact not susceptible of resolution at this stage of the proceedings. The mere fact that prices fell tells nothing about whether the nature and timing of those actions were such as to enhance competition. That liquidation only rules had the effect of depressing the price of silver futures by restricting liquidity in the market, resulting in substantial profits for shorts and substantial losses for longs, Compl. ¶¶ 67–69, does not on its face mandate the characterization, "procompetitive action." Moreover, it would be inappropriate at this point to characterize as procompetitive any and all actions taken by the exchanges that had the effect of lowering the price of silver futures and thereby remove from the reach of the antitrust remedy all losses resulting from those actions.

For the reasons discussed above, the motion by the non-exchange defendants to dismiss the antitrust claims for plaintiff's lack of antitrust standing is denied.

\* \* \*

In sum: the motions to dismiss the CEA and RICO claims as barred by the applicable statutes of limitations are granted as to

all defendants. Brodsky's motion to dismiss for lack of personal jurisdiction is granted. The non-exchange defendants' motion to dismiss the antitrust claims is denied. MACE's motion to dismiss for lack of personal jurisdiction and improper venue and the exchange defendants' motion to dismiss the antitrust claims are granted without prejudice.

The latter motions are granted without prejudice because we recognize that in antitrust cases dismissals on the pleadings should be sparingly granted, *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976), and because cases such as this are fraught with a public interest going beyond the concerns of the individual plaintiffs involved. However, before further pleadings are submitted, a conference will be held to discuss whether the complaint can be amended to correct the deficiencies noted in this memorandum opinion in accordance with the requirements of Fed.R.Civ.P. 11.

It is so ordered.